# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2065-15T2
A-0556-16T1
A-1455-16T3
A-3280-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

G.E.P.,[1]

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

R.P.,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

March 27, 2019

APPELLATE DIVISION

---

[1] We use initials and pseudonyms to preserve the confidentiality of these proceedings. R. 1:38-3(c)(9).

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

C.P.,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

C.K.,

      Defendant-Appellant.

_____

> Argued January 24, 2019 – Decided March 27, 2019
>
> Before Judges Koblitz, Ostrer and Mayer.
>
> On appeal from Superior Court of New Jersey, Law Division, Morris County, Indictment No. 11-02-0138, Bergen County, Indictment No. 07-11-1924, Gloucester County, Indictment No. 13-08-0761, and Camden County, Indictment No. 15-09-2680.
>
> Lawrence S. Lustberg argued the cause for appellant in A-2065-15 (Gibbons PC, attorneys; Lawrence S. Lustberg and Amanda B. Protess, on the briefs).
>
> Joseph E. Krakora, Public Defender, attorney for appellant in A-0556-16 (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the briefs).

Kelly Anderson Smith argued the cause for appellant in A-1455-16.

Stefan Van Jura, Deputy Public Defender, argued the cause for appellant in A-3280-16 (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

John K. McNamara, Jr., Chief Assistant Prosecutor, argued the cause for respondent in A-2065-15 (Fredric M. Knapp, Morris County Prosecutor, attorney; Erin Smith Wisloff, Supervising Assistant Prosecutor, on the briefs).

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent in A-0556-16 (William P. Miller, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the cause for respondents in A-1455-16 and A-3280-16 (Gurbir S. Grewal, Attorney General, attorney; Sarah E. Elsasser, Deputy Attorney General, of counsel and on the brief in A-1455-16; Lila B. Leonard, of counsel and on the briefs in A-3280-16).

The opinion of the court was delivered by

KOBLITZ, P.J.A.D.

We consolidate these four appeals for the purpose of writing a single opinion because they present the issue of whether State v. J.L.G., 234 N.J. 265, 272 (2018), should be applied retroactively to reverse defendants' convictions of child sexual assault where an expert in "Child Sexual Assault Accommodation Syndrome" (CSAAS) was permitted to testify. We accord

3                                                                    A-2065-15T2

J.L.G. pipeline retroactivity and reverse because the admission of CSAAS expert testimony in these four cases calls into question the validity of each guilty verdict.

## J.L.G.

We first discuss the legal issues and then apply those concepts to each case individually. CSAAS is a theory developed thirty-five years ago by clinical psychiatrist Dr. Ronald Summit, and identifies five categories of behavior commonly demonstrated by child sex abuse victims: "secrecy; helplessness; entrapment and accommodation; delayed, conflicted, unconvincing disclosure; and retraction." Id. at 271. In 1993, our Supreme Court found CSAAS expert testimony was sufficiently reliable to be admitted into evidence. State v. J.Q., 130 N.J. 554, 556 (1993). Expert testimony concerning CSAAS has been used in sex abuse trials throughout the country. J.L.G., 234 N.J. at 271.

In J.L.G., our Supreme Court ruled that expert testimony about CSAAS was not reliable except as to delayed disclosure. The Court stated:

> Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory -- delayed disclosure -- because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than

4

delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. See N.J.R.E. 702. In particular, the State must show that the evidence is beyond the understanding of the average juror.

[Id. at 272.]

The Court noted that admissibility of CSAAS expert testimony "will turn on the facts of each case," especially the victim's explanation for delayed disclosure. Ibid. Where a victim gives "straightforward reasons about why she delayed reporting abuse, the jury [does] not need help from an expert to evaluate her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid.

## Retroactivity

These cases were pending on appeal at the time J.L.G. was decided. Our retroactivity analysis begins with the threshold question: "whether a new rule of law has been announced." State v. Feal, 194 N.J. 293, 307 (2008); see also State v. Burstein, 85 N.J. 394, 403 (1981) ("As the very term implies, retroactivity can arise only where there has been a departure from existing law.").

A case announces a new rule of law for retroactivity purposes if there is a "'sudden and generally unanticipated repudiation of a long-standing practice.'" State v. Purnell, 161 N.J. 44, 53 (1999) (quoting State v. Afanador, 151 N.J. 41, 58 (1997)). A new rule exists

5

if "'it breaks new ground or imposes a new obligation on the States or the Federal Government . . . [or] if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final.'" <u>State v. Lark</u>, 117 N.J. 331, 339 (1989) (quoting <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989)).

[<u>Feal</u>, 194 N.J. at 308 (alteration in original).]

Where a new rule of law is introduced, the court has four options:

(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule [pipeline] retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect . . . .

[<u>Burstein,</u> 85 N.J. at 402-03.]

Three factors are considered in determining which retroactive application is appropriate: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." <u>Feal</u>, 194 N.J. at 308 (quoting <u>State v. Knight</u>, 145 N.J. 233, 251 (1996)); <u>see also</u> <u>State v. Henderson</u>, 208 N.J. 208, 300-01 (2011).

6                                                      A-2065-15T2

The first factor is often considered the most pivotal. Knight, 145 N.J. at 251; see also Henderson, 208 N.J. at 301 (noting that these three "factors are not of equal weight"). Retroactive application is appropriate where "the purpose of the new rule 'is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function' and raises 'serious question[s] about the accuracy of guilty verdicts in past trials . . . .'" Feal, 194 N.J. at 308-09 (quoting Burstein, 85 N.J. at 406-07); see also State v. Cassidy, 235 N.J. 482, 498, 501-02 (2018) (reversing over 20,000 drunk driving convictions based on improperly calibrated breathalizer machines).

Full retroactivity has been afforded in situations that strike "at the heart of the truth-seeking function," such as:

> the requirement that the State may not escape its burden of proof beyond a reasonable doubt by using presumptions to shift burdens of proof to the defense, Hankerson v. North Carolina, 432 U.S. 233 (1977); the requirement that, in juvenile proceedings, the State prove beyond a reasonable doubt all elements of an offense that would constitute a crime if committed by an adult, Ivan V. v. City of New York, 407 U.S. 203 (1972); the right to counsel at preliminary hearings in which a defendant must assert certain defenses or lose them, Arsenault v. Massachusetts, 393 U.S. 5, 89 (1968); the rule barring the admission of [one] co-defendant's extrajudicial confession implicating another defendant, Roberts v. Russell, 392 U.S. 293 (1968); the right to counsel at trial, Pickelsimer v. Wainwright, 375 U.S. 2 (1963); and the requirement that a confession made some time ago meet current

A-2065-15T2

standards of voluntariness, Reck v. Pate, 367 U.S. 433 (1961).

[Feal, 194 N.J. at 309 (quoting Burstein, 85 N.J. at 407).]

However, "where the new rule is designed to enhance the reliability of the fact-finding process, but the old rule did not 'substantially impair' the accuracy of that process, a court will balance the first [factor] against the second and third [factors]." Ibid. (quoting Burstein, 85 N.J. at 408).

In considering the second factor, the degree of reliance, a court analyzes whether the old rule was administered in "good faith reliance on 'then-prevailing constitutional norms.'" State v. Howery, 80 N.J. 563, 570 (1979) (quoting United States v. Peltier, 422 U.S. 531, 536 (1975)). In considering the third factor, the administration of justice, "retroactivity will not be afforded if it 'would undermine the validity of large numbers of convictions.'" Feal, 194 N.J. at 309 (quoting Knight, 145 N.J. at 252). "Ultimately, the retroactivity determination turns on the court's view of 'what is just and consonant with public policy in the particular situation presented.'" Id. at 309-10 (quoting Knight, 145 N.J. at 251).

Because all four cases were pending on appeal at the time J.L.G. was issued, we must decide only whether pipeline retroactivity is appropriate. Our Supreme Court has restricted the use of CSAAS expert testimony over the years.

See J.Q., 130 N.J. at 574-75, 582 (CSAAS testimony may be used to help explain, for example, why an alleged victim delayed reporting but may not be used to establish guilt or innocence of the defendant); State v. P.H., 178 N.J. 378, 383, 399 (2004) (reversing the conviction where the court gave confusing instructions regarding the jury's consideration of a delay in reporting abuse, which impaired a "defendant's right to have the jury fully evaluate witness credibility"); State v. R.B., 183 N.J. 308, 327-28 (2005) (finding that a "CSAAS expert should not describe the attributes exhibited as part of that syndrome due to the risk that the jury may track the attributes of the syndrome to the particular child in the case"); State v. W.B., 205 N.J. 588, 613-14 (2011) (holding that a CSAAS expert shall not present "[s]tatistical information quantifying the number or percentage of abuse victims who lie" about sexual abuse); State v. J.R., 227 N.J. 393, 416-17 (2018) (finding that, "[t]o avoid confusing a jury, a CSAAS expert should not cite another case—particularly a publicized incident that resulted in a conviction," when testifying, and "[a]s a general rule," a CSAAS expert should not testify "as the State's initial witness, prior to the testimony of the child victim"). These cases demonstrate the risk, even before J.L.G., that CSAAS testimony could impair the fact-finding process, and unfairly tip the balance against a defendant charged with sexual assault of a child.

Pipeline retroactivity is appropriate here, because it would afford defendants relief from unfair convictions, while not unduly burdening the criminal justice system. The purpose of the holding in J.L.G. is to avoid unjust convictions in which the State's proofs are unfairly bolstered by expert opinion that lacks a reliable basis. This factor looms largest in our analysis. We recognize that prosecutors widely utilized CSAAS testimony consistent with pre-J.L.G. case law. However, pipeline retroactivity would not significantly burden the administration of justice. In Henderson, the Court decided to apply a new rule purely prospectively, reasoning that "[t]o reopen the vast group of cases decided over several decades, which relied not only on settled law but also on eyewitness memories that have long since faded, would 'wreak havoc on the administration of justice [. . . .]'" Henderson, 208 N.J. at 302 (quoting State v. Dock, 205 N.J. 237, 258 (2011)); see Knight, 145 N.J. at 252 (noting that a new rule is generally not provided retroactivity "when such an application would undermine the validity of large numbers of convictions" and "overwhelm[] courts").

Unlike in Henderson, where the Court considered a vast number of cases of all kinds where an eye-witness identification contributed to conviction, see 208 N.J. at 302, here the State represents that after an Attorney General "informal survey . . . at least forty (40) cases" were pending on appeal and would

10                                                                    A-2065-15T2

be affected by pipeline retroactivity. In sum, in applying the three factors used for identifying the appropriate form of retroactivity, we conclude that J.L.G. should be given at least pipeline retroactivity.

Error

The admissibility of CSAAS expert testimony was raised below by defendant G.E.P., who argued that the victim was no longer a child. Neither R.P. nor C.K. raised the issue, and C.P. argued at trial that the CSAAS expert's testimony exceeded the permissible scope of such testimony. Neither trial courts nor defendants can be expected to anticipate a new rule of law. See Knight, 145 N.J. at 242, 258 (according new rule pipeline retroactivity without articulating a standard of error, although the defendant did not raise the issue below, as evidenced in the Appellate Division decision: State v. Knight, 283 N.J. Super. 98, 108 (App. Div. 1995)). But see Feal, 194 N.J. at 312 (discussing plain error when according a new rule pipeline retroactivity). Because the admission of CSAAS expert testimony met the plain error standard in all four cases, in that it raised a doubt as to the validity of the jury verdict, State v. Daniels, 182 N.J. 80, 95 (2004), we will not belabor this discussion further.

In J.L.G., the Court found the admission of CSAAS testimony harmless. The State presented evidence including an audio recording of an act of sexual abuse made by the victim weeks before she spoke to police, an eyewitness

11

account of the defendant sexually aroused while lying on top of the victim, and police-recorded telephone conversations where the defendant offered the victim money and other items not to testify against him. 234 N.J. at 273-75.

As we discuss in more detail below, the corroboration of the victim's testimony in each case was far less than in J.L.G.

Experts

Under N.J.R.E. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." J.L.G. held that CSAAS expert testimony was admissible only when the reasons for delayed disclosure are "beyond the ken of the average juror[, which] will depend on the facts of the case." 234 N.J. at 305. The Court continued:

> If a child witness cannot offer a rational explanation for the delay in disclosing abuse . . . expert evidence may be admitted to help the jury understand the child's behavior. In this context, we do not accept that jurors can interpret and understand an explanation that is not offered.
>
> [Ibid.]

Where, however, a teenage victim is able to explain her delay in reporting, no expert testimony should be admitted. Id. at 305.

Dr. Anthony D'Urso, Psy.D., and Dr. Julie Lippmann, Psy.D., provided CSAAS testimony in these matters. Dr. D'Urso testified at the trials of G.E.P. and R.P. He testified that he is the section chief and supervising psychologist at the Audrey Hepburn Children's House, a regional child abuse diagnostic center. Dr. Lippman testified at the trials of C.P. and C.K. Dr. Lippmann testified that she had been the senior supervising psychologist at the Child Abuse Research, Education and Service (CARES) Institute.[2] Both doctors told the jury of their advanced degrees and extensive experience before being qualified as experts without objection. Both doctors identified the five CSAAS behaviors: secrecy; helplessness; entrapment, coercion or accommodation; delayed or unconvincing disclosure; and retraction. They testified that the first three behaviors typically occur prior to disclosing the alleged abuse, while the latter two behaviors typically occur after disclosing the abuse.

In all four cases, Dr. D'Urso and Dr. Lippmann testified after the victim's testimony. During cross-examination of each victim, defense counsel sought to attack the credibility of the victim by focusing largely on the victim's delayed reporting of abuse, inconsistent statements, and, if applicable, retraction. The

---

[2] At the time of her testimony, Dr. Lippmann was retired but maintained a small private practice.

A-2065-15T2

experts in these cases then testified that a truthful child sex abuse victim may exhibit these behaviors.

One of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination. State v. Branch, 182 N.J. 338, 348-49 (2005); see also Perna v. Pirozzi, 92 N.J. 446, 456 (1983) ("A paramount purpose of cross-examination is the impeachment of the credibility of the witness."). Generally, direct testimony cannot be deemed reliable unless tested in the "crucible of cross-examination." Branch, 182 N.J. at 348. "Cross-examination is routinely regarded as the most effective means of challenging the credibility of a witness and thereby discovering the truth." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 607 (2018). Any witness "may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony." State v. Silva, 131 N.J. 438, 444-45 (1993) (quoting State. v. Bryant, 523 A.2d 451, 466 (Conn. 1987)).

Here, by informing the jury that delayed disclosure, inconsistent statements, and retraction may be behaviors exhibited by a truthful child sex abuse victim, the CSAAS experts' testimony effectively nullified defense counsels' efforts to test the credibility of the victims on cross-examination. This improper expert testimony undermined defendants' right to confront their accusers. See Branch, 182 N.J. at 348 ("The right of confrontation is an essential

14

attribute of the right to a fair trial, requiring that a defendant have a 'fair opportunity to defend against the State's accusations.'") (quoting State v. Garron, 177 N.J. 147, 169 (2003)).

G.E.P.

Defendant G.E.P. was convicted of thirteen crimes: four counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(c); five counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4) by engaging in intercourse, oral sex and sexual touching with his ex-girlfriend's daughter, Jane, before and after her thirteenth birthday. The court sentenced G.E.P. to an aggregate term of thirty years in prison.[3]

Jane, who was thirty-six years old at the time of the trial, testified extensively about the abuse she allegedly suffered. Jane testified that G.E.P. began committing sexual assaults on her soon after he moved in with her mother, when she was six or seven years old. She testified that the sexual encounters, which began with touching, occurred on a regular basis, becoming progressively more intense, until she and G.E.P. were engaging in oral sex and intercourse

---

[3] The No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, was inapplicable because it was enacted in 1997 and the offenses were alleged to have occurred between 1986 and 1995.

when she was about ten or eleven years old. G.E.P. last engaged in this sexual activity with her when she was fifteen or sixteen years old, a year or two after he had moved out of her mother's apartment.

Jane's testimony provided the basis for introducing various items seized from a bag taken from G.E.P.'s office. She stated that, around the time they started having sex, he used Velcro straps to "bind [her] breasts." In addition, she testified that he bought and had her wear bras that he cut out. Jane previously testified at a Rule 404(b) evidentiary hearing that the binding lasted until around the time that the two stopped having intercourse, when she told G.E.P. that she was not "doing this anymore." At trial, Jane noted the items were always stored in a bag similar to the one found.

Jane identified the Velcro straps and ropes seized by the State as "not the same but . . . very similar" to the sort of straps she had been made to use. She also noted that the seized clothespins, rubber bands, rope, and intact bra were all similar to the sort of items that G.E.P. had used with her.

Jane also testified that her relationship with G.E.P. was complicated by the fact that she had true feelings of affection for him. She testified that she considered him to be a father figure and "would want to see him to get support or guidance . . . ." She testified that she still cared for him and continued to visit him on occasion after they stopped having intercourse. The visits continued

until approximately 2007, well after she went to college. During these visits, G.E.P. fondled Jane's breast and kissed her neck or breast. Jane testified that "there was no below the belt action . . . ." Jane attended G.E.P.'s wedding in 1996, and sent him a Christmas card with a photograph of her daughter on at least one occasion.

Jane testified that she did not report G.E.P.'s abuse as a child because G.E.P. gave her the impression when she was very young that "everybody does it." G.E.P. also told her their relationship was "special," that "he was in love with [her,] and that [they were] soul mate[s]" who would "make a life together . . . ." At other times, they discussed the disastrous impact that this information would have on her family and G.E.P. if the information became public.

Jane testified that she reported the abuse in 2009 out of concern for G.E.P.'s adopted daughter who "looked just like [her]" and was nine years old, around the same age as Jane when G.E.P. began to abuse her. When Jane reported the abuse, the police recorded a phone call between her and G.E.P. The audio recording of this phone call was played during Jane's testimony, and the jurors were provided transcripts to follow along. While G.E.P. made a few cryptic, salacious comments, he did not admit to any specific sexual activity, despite Jane's efforts to obtain an incriminating statement.

Cross-examination of Jane focused on her delayed reporting of the abuse and inconsistencies between her prior statements and her trial testimony. During the pretrial N.J.R.E. 404(b) evidentiary hearing, defense counsel observed in particular that she did not originally mention most of the items she later stated had been used by G.E.P.

Dr. D'Urso testified not only about why children may delay reporting, but also that children frequently "may retract or recant the allegation." He also testified "a child isn't going to necessarily say the same thing to every person who interviews them in the course of this investigation." Jane initially told the police about "straps," allegedly used by G.E.P. Almost six years later, after sexual paraphernalia found by the police in G.E.P.'s office was shown to her, for the first time Jane alleged those items had also been used.

G.E.P. testified and denied he ever had sexual intercourse with Jane. G.E.P. acknowledged that he and Jane "wound up necking" on one occasion around 1996 when Jane was more than sixteen years old, during "a really low point" in his life. He further stated that he was "not happy . . . or proud of" the incident and "felt like it was too weird and odd, and not appropriate." G.E.P. stated that after this incident he "just sort of pulled away" to focus on his girlfriend, who is now his wife.

G.E.P. argues on appeal:

POINT I: THE TRIAL COURT DEPRIVED DEFENDANT OF A FAIR TRIAL BY ADMITTING EXPERT TESTIMONY ON CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME AND FAILING TO LIMIT ITS USE TO THE PERIOD WHEN THE ALLEGED VICTIM WAS A CHILD.

POINT II: THE ERRONEOUS ADMISSION OF EVIDENCE THAT DEFENDANT HAD SUBSEQUENT LEGAL INTIMATE CONTACT WITH THE ALLEGED VICTIM TO EXPLAIN HER DELAY IN BRINGING THESE ALLEGATIONS VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE.

POINT III: THE TRIAL COURT ERRED IN DECLINING TO GRANT A MISTRIAL BASED ON [JANE'S] INTERJECTION OF BARRED FRESH COMPLAINT TESTIMONY THAT IMPERMISSIBLY BOLSTERED HER CREDIBILITY.

POINT IV: THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF ITEMS SIMILAR TO THOSE ALLEGED TO HAVE BEEN USED ON JANE TO CORROBORATE [JANE'S] ACCOUNT.

As we have explained, applying the holding in J.L.G., we conclude that the admission of the CSAAS testimony presented the real possibility of an unjust result that requires reversal. Jane's credibility was the lynchpin of the State's case.

G.E.P.'s appeal of the trial court's admission of evidence pursuant to N.J.R.E. 404(b), its denial of his request for a mistrial, and its admission of items similar to those allegedly used on Jane are without sufficient merit to warrant

19

discussion in a written opinion. R. 2:11-3(e)(2). We emphasize that evidentiary rulings are within the discretion of the trial court. State v. Scott, 229 N.J. 469, 479 (2017). Relevant evidence is evidence that has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Two elements must be satisfied; the first element is known as probative value. "Probative value 'is the tendency of the evidence to establish the proposition that it is offered to prove.'" State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Wilson, 135 N.J. 4, 13 (1994)). The second element is known as materiality. "A material fact is one which is really in issue in the case." Ibid. (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)). A relevancy determination focuses on "the logical connection between the proffered evidence and a fact in issue." State v. Williams, 190 N.J. 114, 123 (2007) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 15 (2004)). The test for relevance is broad and favors admissibility. State v. Deatore, 70 N.J. 100, 116 (1976).

An appellate court reviews a trial court's evidentiary rulings under an abuse of discretion standard. Scott, 229 N.J. at 479. Therefore, "[a] reviewing court must not 'substitute its own judgement for that of the trial court' unless there was a 'clear error in judgment'—a ruling 'so wide of the mark that a

manifest denial of justice resulted.'" Ibid. (quoting State v. Perry, 225 N.J. 222, 233 (2016)).  Here, the trial court did not abuse its discretion.

## R.P.

Defendant R.P. was convicted of nine crimes:  three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) by digitally penetrating, performing oral sex and engaging in sexual contact with his stepdaughter, Susan, before her thirteenth birthday.  The court sentenced R.P. to an aggregate term of twenty-five years in prison, with eighty-five percent parole ineligibility, pursuant to the NERA.

Susan, who was thirteen years old at the time of trial, testified that R.P. began abusing her when she was in third grade.  R.P. kissed her on the mouth, lay on top of her or placed her on top of him, and "poke[d]" her breasts.  He anally penetrated Susan with his fingers when she was in fourth grade.  R.P.'s actions continued to intensify when Susan was in fifth grade, and he began performing oral sex.  Susan testified that R.P. tried to have intercourse with her but she prevented him from doing so.  She testified that the sexual encounters occurred on a regular basis.

Susan testified that she did not immediately report R.P.'s abuse because she was "frightened" and R.P. "told [her] not to tell . . . ." Susan "[thought] something bad would happen" to her mother or family members if she reported the abuse. Susan also testified that she and R.P. made a "deal," in which she told him that she did not want any more physical contact, and R.P. initially agreed. After about two or three days, however, R.P. told Susan "the deal was off."

Susan eventually told her mother about the abuse, because she "couldn't hold it in anymore," she was unable to concentrate in school, and she was worried about becoming pregnant. After Susan told her mother, she was examined at a hospital, seen by a psychiatrist, and questioned by a Division of Youth and Family Services[4] representative and "investigators."

Susan then retracted her statement, and then retracted the retraction. Four witnesses, including two attorneys, testified that Susan told them her original disclosure was a lie. Cross-examination of Susan focused on her delayed reporting and the retraction of her accusation.

Dr. D'Urso, testified as he had in G.E.P.'s trial. In particular, he explained that a child may retract his or her statement or try to minimize what was revealed

---

[4] L. 2012, c. 16, effective June 29, 2012, reorganized the Department of Children and Families and renamed the Division of Youth and Family Services as the Division of Child Protection and Permanency.

if the abuse was intra-familial and the child "feels unsupported or at risk." R.P. did not testify.

R.P. argues on appeal:

> POINT I: TESTIMONY CONCERNING CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME FAILS TO MEET THE EVIDENTIARY STANDARD FOR RELIABILITY, AND WAS SUFFICIENTLY CENTRAL TO THE STATE'S CASE THAT REVERSAL IS REQUIRED. (NOT RAISED BELOW.)
>
> A. EVIDENCE CONCERNING CSAAS FAILS THE FUNDAMENTAL TEST OF RELIABILITY.
>
> B. ANY ULTIMATE RULING CONCERNING CSAAS SHOULD APPLY RETROACTIVELY HERE.
>
> POINT II: THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.
>
> A. THE IMPOSITION OF CONSECUTIVE SENTENCES CONSTITUTED AN ABUSE OF DISCRETION.
>
> B. THE QUANTUM OF THE SENTENCE IS EXCESSIVE.

The CSAAS expert testimony improperly bolstered the victim's testimony, raising a reasonable doubt as to the validity of the verdict. Because we remand for a new trial based on the holding in J.L.G., we need not address R.P.'s sentencing argument.

23

Defendant C.P. was indicted on twenty-two counts, twenty-one of which were for sexual assault by engaging in oral sex, digital penetration, and sexual contact with his stepdaughter, Nancy, before and after her thirteenth birthday. C.P.'s first trial ended in a mistrial because the jury could not reach a unanimous decision. The State then retained CSAAS expert Dr. Lippmann to testify at the second trial. After the second trial, the jury found C.P. guilty on all counts: three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); four counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); three counts of second-degree aggravated sexual contact, N.J.S.A. 2C:14-3(a); and one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). The court sentenced C.P. to an aggregate term of forty-six years in prison, with eighty-five percent parole ineligibility, pursuant to NERA.

Nancy, who was nineteen years old at the time of the second trial, testified that C.P. began inappropriately touching her when she was in third grade. The first incident occurred when C.P. rubbed his penis against her vagina while she was sleeping. When Nancy was in fourth grade, C.P. digitally and orally

penetrated her. The following year, they engaged in oral sex. Shortly after Christmas of her fifth grade year, Nancy moved to Florida to live with her biological father in Florida. Nancy lived in Florida until the end of sixth grade, but maintained daily phone contact with C.P. and her younger brothers in New Jersey.

Nancy returned to New Jersey to live with her maternal grandmother during seventh and eighth grade. During that time, Nancy regularly visited C.P.'s home on weekends to see her brothers. During these weekend visits, C.P. digitally penetrated Nancy and they had oral sex. C.P. twice attempted to have intercourse with Nancy during her weekend visits. The second time, Nancy called the police and C.P. took her phone away. When the police arrived, C.P. "went outside to talk to them" and they left without speaking to Nancy. She testified the sexual encounters occurred on a regular and frequent basis.

During their first sexual encounter, C.P. told Nancy that if she screamed or told anyone about what happened that she would not be able to see C.P. anymore. Nancy thought that if she was unable to see C.P., she would no longer see her mother and brothers. Nancy also did not immediately report C.P.'s abuse because C.P. told her that the sexual contact between them was "what little girls do for their fathers." C.P. told Nancy that he was going to marry her. Nancy

further testified that she knew "something wasn't right, but [she] was scared and [she] didn't know what to do or what to say."

Nancy first disclosed the abuse to her boyfriend when she was in eighth grade. She told him that she and C.P. had oral sex and asked him "not to tell any[one] because [she] didn't want to not have contact with [her] brothers anymore."

Around April 2012, when she was in ninth grade, Nancy moved into her great aunt and uncle's home in Florida. After a custody hearing in July, Nancy told them about her history of sexual abuse. The following morning, they called the police and an officer came to their house and took a statement from Nancy. Nancy later gave a statement to police officers in New Jersey. Cross-examination of Nancy focused on her delayed disclosure of the abuse and inconsistencies between her prior statements and trial testimony.

Dr. Lippmann testified: "We should not be automatically dismissive of a child whose disclosure is not necessarily completely consistent in its details . . . ." She also said when a child does disclose the abuse, "it is more likely than not to be after some considerable delay." She continued: "And when they tell after such a delay, there are times that there are aspects of the disclosure that one might think are inconsistent. A child may tell about part of what happened on

26

one occasion and then . . . perhaps at another time, talk about something else happening."

Dr. Lippmann testified that a child might disclose abuse "after a long period of time" when there is "a change in their family situation or something," and they "then feel comfortable to disclose . . . or feel a need to disclose at that point in time, when they may not have before." C.P. did not testify.

C.P. argues on appeal:

> POINT I: THE TRIAL COURT FAILED TO PROPERLY LIMIT THE SCOPE OF THE CSAAS TESTIMONY.
>
> POINT II: THE TRIAL COURT FAILED TO ISSUE A CORRECTIVE INSTRUCTION IN RESPONSE TO THE STATE'S WITNESS VIOLATING BOUNDARIES OF CSAAS TESTIMONY. (PARTIALLY RAISED BELOW).
>
> POINT III: THE TRIAL COURT ABUSED ITS DISCRETION AND IRREPARABLY PREJUDICED THE DEFENDANT BY EXCLUDING [THE] S.A.I.D. DEFENSE. MOREOVER, THE COURT SHOULD HAVE MINIMALLY CONDUCTED A N.J.R.E. 104 HEARING.
>
> POINT IV: THE TRIAL COURT IMPROPERLY PERMITTED THE HEARSAY TESTIMONY OF [J.P.], THEREBY PREJUDICING DEFENDANT. (PARTIALLY RAISED BELOW).
>
> POINT V: [THE] TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE AND IMPROPERLY IMPOSED CONSECUTIVE SENTENCING. (NOT RAISED BELOW).

27

POINT VI: [THE] TRIAL COURT IMPROPERLY EXCLUDED THE EXCITED UTTERANCE TESTIMONY OF [THE] DEFENSE WITNESS, WHICH DENIED DEFENDANT OPPORTUNITY TO PURSUE DECEPTIVE MOTIVES BY THE VICTIM AND HER FAMILY.

POINT VII: THE CUMULATIVE ERRORS COMMITTED BY THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL AND RESULTED IN A MANIFEST INJUSTICE. (NOT RAISED BELOW).

In light of the holding of J.L.G., we remand for a new trial. The fact that the first jury was unable to reach a verdict and the second jury convicted only after hearing the improper CSAAS expert testimony, supports reversal. We affirm without further discussion the trial court's evidentiary decisions to preclude "Sexual Abuse in Divorce/Custody Syndrome" (S.A.I.D.) evidence and excited utterance testimony of defense witnesses. We also affirm the trial court's admission of J.P.'s testimony. The trial court's evidentiary decisions did not constitute an abuse of discretion. Because we remand for a new trial, we need not address C.P.'s sentencing argument or his argument that the trial court's "cumulative errors" denied him a fair trial.

## C.K.

Defendant C.K. was convicted of nine crimes: three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); four counts of second-degree

sexual assault, N.J.S.A. 2C:14-2(b); and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) by digitally penetrating, and engaging in sexual contact and intercourse with his biological daughter, Julie, before her thirteenth birthday. The court sentenced C.K. to an aggregate term of thirty years in prison, with eighty-five percent parole ineligibility, pursuant to NERA.

Julie, who was seventeen years old at the time of trial, testified that C.K. first digitally penetrated her when she was six years old. Julie testified that she stopped having sexual contact with C.K. when she was about eight years old. The abuse resumed, however, when Julie was nine years old. C.K. digitally penetrated Julie, touched her breasts, and had intercourse with her. These incidents occurred until Julie was eleven years old.

When Julie was fifteen years old, she and C.K. argued in front of her mother. Twice Julie told C.K. that she did not respect him because he "raped" her. Julie did not explain to her mother what she meant by that statement. Julie "felt like [she] couldn't" tell her mother what happened. About two weeks later, Julie told her best friend that C.K. "raped" her. Her friend told her mother, who contacted the police.

Cross-examination of Julie focused on inconsistencies between her prior statements and trial testimony. Defense counsel questioned her about what she remembered, and to whom and when she disclosed the abuse.

The State conceded at the outset of trial that its case depended on Julie's testimony rather than physical evidence. The State introduced expert testimony from Dr. Marita Lind, a pediatrician who examined Julie when she was approximately fifteen years old. Dr. Lind testified Julie showed signs of "special learning needs." Dr. Lind also testified to Julie's medical history, which included anxiety and the need for a school aide. Dr. Lind observed no signs of scarring, healed trauma, or sexually transmitted diseases. Dr. Lind testified that because the sexual abuse Julie recounted ended several years ago, she would not expect any injuries to be present at the time she examined her. Dr. Lind did not observe evidence of separation of Julie's hymen, and noted that this was contrary to what she would generally expect to see in a child who was penetrated at the age of six. However, she noted that "[i]f the penis penetration is -- what little girls often term as inside, which is between their labia . . . then I wouldn't necessarily expect to see any trauma."

Dr. Lippman testified as she had in C.P.'s trial. She also explained that a child's cognitive ability "may affect how a child will make a disclosure." She testified that "[c]ognitive abilities will affect memory, affect verbalization, will

30

affect conceptual ability, and in addition there are other kinds of factors" such as "various emotional issues that may intervene and may influence how and when . . . [a child] disclose[s]" the abuse.  The court failed to give the jury the then-current cautionary charge regarding CSAAS testimony.[5]  C.K. did not testify.

---

[5]  The model jury charge stated:

### CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME
### (WHERE STATE PRESENTS EVIDENCE THEREOF)

The law recognizes that stereotypes about sexual assault complaints may lead some of you to question [complainant's] credibility based solely on the fact that [he/she] did not complain about the alleged abuse earlier.  You may or may not conclude that his/her testimony is untruthful based only on his/her [silence/delayed disclosure] [CHOOSE APPLICABLE TERM].  You may consider the [silence/delayed disclosure] along with all other evidence including [complainant's] explanation for his/her silence/delayed disclosure in deciding how much weight, if any, to afford to complainant's testimony.  You may also consider the expert testimony that explained that silence/delay is one of the many ways in which a child may respond to sexual abuse.  Accordingly, your deliberations in this regard should be informed by the testimony presented concerning the child sexual abuse accommodation syndrome.

You may recall evidence that (NAME) [failed to disclose, or recanted, or acted or failed to act in a way addressed by the Child Sexual Abuse Accommodation Syndrome].  In this respect, Dr. [A], Ph.D., testified on behalf of the State [and Dr. [B], Ph.D., testified on behalf of the defendant].  Both witnesses were qualified as experts as to the Child Sexual Abuse Accommodation Syndrome.  You may only consider the testimony of these experts for a limited purpose, as I will explain.

You may not consider Dr. [A]'s testimony as offering proof that child sexual abuse occurred in this case.  [Likewise, you may not consider Dr. [B]'s testimony as proof that child sexual abuse did not occur].  The Child Sexual Abuse Accommodation Syndrome is not a diagnostic device and cannot

31

C.K. argues on appeal:

POINT I: THE TRIAL COURT VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO COUNSEL OF HIS CHOICE AND TO REPRESENT

determine whether or not abuse occurred. It relates only to a pattern of behavior of the victim which may be present in some child sexual abuse cases. You may not consider expert testimony about the Accommodation Syndrome as proving whether abuse occurred or did not occur. Similarly, you may not consider that testimony as proving, in and of itself, that _____, the alleged victim here, was or was not truthful.

Dr. [A]'s testimony may be considered as explaining certain behavior of the alleged victim of child sexual abuse. As I just stated, that testimony may not be considered as proof that abuse did, or did not, occur. The Accommodation Syndrome, if proven, may help explain why a sexually abused child may [delay reporting and/or recant allegations of abuse and/or deny that any sexual abuse occurred].

To illustrate, in a burglary or theft case involving an adult property owner, if the owner did not report the crime for several years, your common sense might tell you that the delay reflected a lack of truthfulness on the part of the owner. In that case, no expert would be offered to explain the conduct of the victim, because that conduct is within the common experience and knowledge of most jurors.

Here, Dr. [A] testified that, in child sexual abuse matters, [SUMMARIZE TESTIMONY]. This testimony was admitted only to explain that the behavior of the alleged victim was not necessarily inconsistent with sexual abuse. [CHARGE, IF APPLICABLE: here, Dr. [B] testified that, in child sexual abuse matters, [SUMMARIZE TESTIMONY]. This testimony was admitted only to explain that the behavior of the victim was not necessarily consistent with sexual abuse].

The weight to be given to Dr. [A]'s [or Dr. [B]'s] testimony is entirely up to you. You may give it great weight, or slight weight, or any weight in between, or you may in your discretion reject it entirely.

You may not consider the expert testimony as in any way proving that [defendant] committed, or did not commit, any particular act of abuse. Testimony as to the Accommodation Syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. Model Jury Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011) (footnotes omitted).

A-2065-15T2

HIMSELF BY FAILING TO ENGAGE IN THE REQUISITE INQUIRIES WHEN DEFENDANT INDICATED AN INABILITY TO WORK WITH ASSIGNED COUNSEL.

A.   DEFENDANT WAS DENIED HIS RIGHT TO COUNSEL OF CHOICE.

B.   DEFENDANT WAS DENIED HIS RIGHT OF SELF-REPRESENTATION.

POINT II:   DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY A FAULTY FRESH COMPLAINT INSTRUCTION WHICH LIMITED THE PERMISSIBLE PURPOSE OF THE TESTIMONY OF ONLY ONE OF THE FOUR WITNESSES WHO REPEATED THE VICTIM'S HEARSAY ACCUSATIONS OF ABUSE.   (NOT RAISED BELOW).

POINT III:   TESTIMONY ABOUT THE CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME SHOULD NOT HAVE BEEN ADMITTED UNDER N.J.R.E. 702, WHICH ALLOWS FOR EXPERT-OPINION TESTIMONY, BECAUSE IT IS NOT BASED ON RELIABLE SCIENCE.   FURTHERMORE, EVEN IF IT WERE RELIABLE, THE FAILURE TO PROVIDE THE JURY WITH THE CORRESPONDING MODEL CHARGE WAS HARMFUL ERROR. (NOT RAISED BELOW.)

A.   TESTIMONY ABOUT CSAAS SHOULD NOT HAVE BEEN ADMITTED.

B.   THE FAILURE TO PROVIDE THE JURY WITH THE MODEL CHARGE ON CSAAS WAS HARMFUL ERROR.

A-2065-15T2

POINT IV: THE AGGREGATE THIRTY-YEAR PRISON SENTENCE, WITH A MANDATORY [EIGHTY-FIVE PERCENT] PERIOD OF PAROLE INELIGIBILITY, IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE FOR A FIRST-TIME OFFENDER, AND SHOULD BE REDUCED.

Although defense counsel did not object at trial to the failure to charge the jury regarding CSAAS testimony, a faulty jury charge is a poor candidate for harmless error. State v. Weeks, 107 N.J. 396, 410 (1987). "When expert evidence on delay is introduced, trial courts should provide appropriate limiting instructions to the jury -- both before an expert witness testifies and as part of the court's final charge." J.L.G., 234 N.J at 304. An appropriate jury instruction on delayed disclosure should explain that delay is not dispositive, but nonetheless "dispel misconceptions about delayed reporting" and explain that such evidence "may be considered in assessing a witness's credibility." Ibid. Careful jury charges are particularly important where CSAAS testimony is proffered. J.R., 227 N.J. at 411, 413-14 ("The line between the discrete rehabilitative purpose of CSAAS testimony and an improper inference as to the defendant's guilt is fine indeed . . . .").

> Our case law acknowledges . . . the significant risk that jurors may misconstrue the expert's observations to be proof of the child's credibility and the defendant's guilt; it thus imposes strict limits on the evidence. The Court's decisions urge trial courts and counsel to proceed with caution and care in the presentation of CSAAS testimony before a jury.

34

[<u>Id.</u> at 414.]

Here, the court provided the jury only with an instruction as to how to generally consider expert evidence, both before the expert's CSAAS testimony and in the final charge. The court said: "You're not bound by such expert's opinion, but you should consider each opinion and give it the weight to which you deem it is entitled whether that be great or slight or you may reject it."

This general charge is insufficient to guard against the jury according too much weight to the CSAAS expert testimony. We reverse C.K.'s conviction, as we do those of the other three defendants, because the CSAAS testimony exceeded the bounds authorized by <u>J.L.G.</u>, which we afford pipeline retroactivity. We also reverse because the trial court failed to deliver the applicable jury instruction on the proper use of CSAAS testimony, as then permitted. Because we remand for a new trial, we need not reach C.K.'s remaining arguments concerning an improper fresh complaint instruction, violation of his right to counsel of his choosing or to represent himself, and an excessive sentence.

In all four cases on review, the State relied almost entirely on the credibility of the victim. All victims gave "straightforward reasons" for their delay in reporting. <u>See</u> <u>J.L.G.</u>, 234 N.J. at 272. Admission of the CSAAS expert testimony, which severely impaired the defense's ability to test the victim's

35

credibility, was "clearly capable of producing an unjust result." R. 2:10-2. The admission of now largely debunked expert evidence was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION