SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. G.E.P.; State v. R.P.; State v. C.P.; State v. C.K. (A-4-19) (082732)**

**Argued March 30, 2020 -- Decided August 5, 2020**

**SOLOMON, J., writing for the Court.**

Child Sexual Abuse Accommodation Syndrome (CSAAS) includes five "preconditions" that purportedly explain behaviors exhibited by sexually abused children: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. In State v. J.L.G., the Court rejected the use of CSAAS evidence -- with the exception of certain testimony concerning delayed disclosure -- as lacking "a sufficiently reliable basis in science to be the subject of expert testimony." 234 N.J. 265, 272 (2018). In these consolidated appeals, the Court considers whether J.L.G.'s invalidation of CSAAS evidence should apply retroactively.

G.E.P., R.P., C.P., and C.K. were convicted and sentenced for committing sexual crimes against children.

The State claims that G.E.P. repeatedly sexually assaulted "Jane" during a ten-year period beginning in the mid-1980s. According to Jane, the abuse began when she was six or seven years old and G.E.P. was twenty-six or twenty-seven and living with Jane and her mother. According to Jane, in addition to other forms of abuse, G.E.P. occasionally bound her breasts with Velcro straps, placed rubber bands and clothespins on her nipples, and made her wear bras with holes cut out. Years later, Jane reported her sexual abuse to police, allegedly out of fear that G.E.P. would abuse his newly adopted daughter. At the urging of police, Jane agreed to call G.E.P. and permitted a detective to record the conversation. While G.E.P. did not admit to any specific sexual activity on the recorded call with Jane, his responses were damning, compelling evidence of guilt. A subsequent search of G.E.P.'s office revealed a plastic bag containing a bra and a toiletry bag containing rope, Velcro straps, rubber bands, and clothespins. During Jane's testimony, the State played audio of the recorded phone call between Jane and G.E.P. The State also introduced the items seized from G.E.P.'s office, and Jane testified that the items were similar to those G.E.P. had used. Over objections by G.E.P., the trial court allowed the State to present expert CSAAS testimony and provided CSAAS instructions to the jury that largely tracked the model jury charge then in effect. G.E.P. was convicted of six counts of first-degree aggravated sexual assault and seven counts of second-degree sexual assault.

1

R.P. married "Susan's" mother. Susan claims that R.P. began regularly sexually abusing her when she was in third grade and continued to abuse her until she informed her mother two years later. R.P. was arrested. Susan later recanted but then reaffirmed her allegations. At trial, the State presented testimony from Susan and the detective from the Prosecutor's Office who initially interviewed Susan. The State also presented an expert witness to provide background information about CSAAS and describe its five components. R.P. did not object to the State's use of CSAAS evidence at trial but did challenge the acceptance of CSAAS testimony on cross-examination and presented a counter-expert. The court provided model CSAAS instructions. A jury convicted R.P. of three counts of first-degree aggravated assault, four counts of second-degree sexual assault, and two counts of second-degree endangering the welfare of a child.

"Nancy," C.P.'s stepdaughter, claimed that C.P.'s sexual abuse of her began when she was in third grade. Nancy eventually confided in her eighth-grade boyfriend about C.P.'s abuse but asked him not to disclose it for fear that the State would remove her siblings. Nancy claimed the abuse continued until later that year when she moved to Florida to live with her great aunt, to whom she also revealed C.P.'s abuse. C.P. was arrested, and his first trial ended in a mistrial when the jury deadlocked. Before C.P.'s second trial, the State and defendant each sought to introduce CSAAS expert testimony, which had not been presented during the first trial. The motion court granted both requests. At the second trial, the State presented, in addition to CSAAS testimony, the testimony of Nancy's great aunt and eighth-grade boyfriend, both of whom recounted their respective conversations with Nancy during which she disclosed C.P.'s alleged abuse. During its final jury charge, the trial court recited the model CSAAS instructions. C.P. was convicted of seven counts of first-degree aggravated sexual assault, eleven counts of second-degree sexual assault, three counts of third-degree aggravated criminal sexual contact, and one count of second-degree endangering the welfare of a child.

"Julie" testified that her abuse began when she was six years old and living in a one-bedroom trailer with C.K., her biological father, as well as her mother, younger sister, and brother. Julie detailed how C.K. would pull down her pants, touch her vagina, and digitally penetrate her at night while her mom was away at work and her younger sister was asleep. Approximately ten years after the alleged abuse began, C.K. asked Julie why she was not respecting him. Julie testified that she responded rhetorically, "Why would I respect someone who raped me[?]" About a week later, Julie confided in a friend from school about C.K.'s abuse. The friend told her mother, who reported the abuse. C.K. was later arrested and indicted. At trial, Julie testified about the abuse, her comment to C.K. about not respecting someone who raped her (which Julie's mother confirmed in her testimony), and her disclosure of the abuse to her friend. The State also presented expert CSAAS testimony. The court gave general expert witness instructions but not CSAAS instructions. The jury convicted C.K. of three counts of first-degree aggravated sexual assault, four counts of second-degree sexual assault, and two counts of second-degree endangering the welfare of a child.

2

Each of the defendants appealed, and the Appellate Division consolidated the cases. 458 N.J. Super. 436 (App. Div. 2019). "Because all four cases were pending on appeal at the time J.L.G. was issued," the court limited its retroactivity review to "whether pipeline retroactivity is appropriate." Id. at 446. It concluded that pipeline retroactivity "would afford defendants relief from unfair convictions, while not unduly burdening the criminal justice system." Id. at 447. The court ultimately determined that "the admission of CSAAS expert testimony in these four cases calls into question the validity of each guilty verdict" and reversed defendants' convictions. Id. at 443.

The Court granted certification. 239 N.J. 598 (2019).

**HELD:** When all factors bearing upon retroactivity are weighed -- whether the rule's purpose "would be furthered by a retroactive application," the State's reliance on the previous rule, and "the effect a retroactive application would have on the administration of justice," State v. Henderson, 208 N.J. 208, 300 (2011) -- pipeline retroactivity is appropriate. Considering the evidence presented in G.E.P.'s case, the admission of CSAAS testimony did not deny him a fair trial, and the Court reverses the Appellate Division's judgment as to him. As to R.P., C.P., and C.K., the CSAAS testimony bolstering the alleged victims' testimony was clearly capable of producing an unjust result, and their convictions were thus properly reversed by the Appellate Division.

1. The underlying legal question in deciding whether a holding will be applied retroactively is whether it announced a new rule of law. The Court first considered and found admissible CSAAS expert testimony in State v. J.Q., 130 N.J. 554, 556 (1993). In a series of later cases, the Court narrowed the permissible scope of CSAAS testimony but did not "reassess the scientific underpinning of CSAAS evidence." In 2018, the J.L.G. Court limited the use of CSAAS evidence to "delayed disclosure," stating that "testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion"; the Court added that the facts of each case will determine whether delayed disclosure expert testimony is needed. 234 N.J. at 303, 305. Plainly, in J.L.G., the Court announced a new rule -- "expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials." Id. at 272. (pp. 22-27)

2. Because J.L.G. announced and applied a new rule of law, the Court now considers whether that rule should have prospective application only (aside from J.L.G.); pipeline retroactivity, which would render it applicable to any cases still on direct appeal, as well as to future cases; or complete retroactive effect. That consideration is guided by three factors -- "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice," Henderson, 208 N.J. at 300 -- which do not receive "equal weight," id. at 301. The first factor, the purpose of the new rule, is often the pivotal consideration. (p. 28)

3

3. Here, application of that first factor rules out full retroactivity. J.L.G. sought to enhance the fact-finding process; the J.L.G. Court did not conclude that admission of CSAAS testimony substantially impaired the accuracy of that process. Indeed, J.L.G. acknowledged the Court's efforts in the years before to ensure the accuracy of past verdicts by refining CSAAS evidence. J.L.G.'s limitation of CSAAS evidence thus bears upon the Court's own standards for criminal justice and is unsuitable for complete retroactivity. The first factor also militates against limiting the application of J.L.G.'s rule to future cases, aside from J.L.G. itself. The typical example of a new rule that would generally be applied only prospectively is an exclusionary rule whose primary goal is deterrence. The rule set forth in J.L.G. aimed to do more than to forestall certain conduct going forward -- it was designed to enhance the reliability of the factfinding process. In short, the first factor favors pipeline retroactivity. The Court therefore considers whether the second and third retroactivity factors outweigh the first here. Under the degree-of-reliance factor, the State in each of these cases administered the old rule in good faith reliance on then-prevailing constitutional norms. As to the effect a retroactive application would have on the administration of justice, it is estimated that approximately forty cases would be affected by pipeline retroactivity -- a number far short of that held sufficient in Henderson to warrant non-retroactivity. Giving pipeline retroactivity to J.L.G. would not present an unreasonable burden on the administration of justice. When all factors bearing upon retroactivity are weighed, pipeline retroactivity is appropriate. The Court is mindful of and finds compelling the survivors' interests here but cannot place their well-founded concerns about having to testify again above a defendant's right to a fair trial. (pp. 28-32)

4. Having concluded that pipeline retroactivity applies, the Court considers whether admission of CSAAS expert testimony in each defendant's case was reversible error. Weighing the evidence presented against G.E.P. and finding no abuse of discretion in the trial court's determinations as to the additional evidentiary issues G.E.P. raised, the Court concludes that the trial court properly denied G.E.P.'s motion for a mistrial. The other cases, aside from the CSAAS evidence presented, were based largely upon the testimony of R.P., C.P., C.K., and their alleged victims. CSAAS testimony bolstering the alleged victims' testimony was thus sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. (pp. 32-37)

**AFFIRMED as to R.P., C.P., and C.K. REVERSED as to G.E.P., whose convictions are REINSTATED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion.**

4

State of New Jersey,

Plaintiff-Appellant,

v.

G.E.P.,

Defendant-Respondent.

_____

State of New Jersey,

Plaintiff-Appellant,

v.

R.P.,

Defendant-Respondent.

_____

State of New Jersey,

Plaintiff-Appellant,

v.

C.P.,

Defendant-Respondent.

_____

State of New Jersey,

Plaintiff-Appellant,

v.

C.K.,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported
at 458 N.J. Super. 436 (App. Div. 2019).

| Argued | Decided |
| --- | --- |
| March 30, 2020 | August 5, 2020 |

Lila B. Leonard, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the briefs).

John McNamara, Jr., Chief Assistant Prosecutor, argued the cause for appellant (Fredric M. Knapp, Morris County Prosecutor, attorney; John McNamara, Jr., of counsel and on the briefs).

Ian C. Kennedy, Assistant Prosecutor, argued the cause for appellant (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, and William P. Miller, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs, and Catherine A. Foddai, Legal Assistant, on the briefs).

Lawrence S. Lustberg argued the cause for respondent G.E.P. (Gibbons, attorneys; Lawrence S. Lustberg and Daniel B. Weinstein, and Anne M. Collart on the briefs).

2

Rochelle M. Watson, Deputy Public Defender, argued the cause for respondent R.P. (Joseph E. Krakora, Public Defender, attorney; Rochelle M. Watson, of counsel and on the briefs).

Kelly Anderson Smith argued the cause for respondent C.P. (Kelly Anderson Smith, of counsel and on the briefs).

Stefan Van Jura, Assistant Deputy Public Defender argued the cause for respondent C.K. (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Tess Borden argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Tess Borden, Alexander Shalom, and Jeanne LoCicero, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

In State v. J.Q., this Court held that expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS) could be admitted "to describe traits found in victims of such abuse to aid jurors in evaluating specific defenses." 130 N.J. 554, 556 (1993). CSAAS includes five "preconditions" that purportedly explain behaviors exhibited by sexually abused children: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. Id. at 568-70. In State v. J.L.G., we rejected the use of CSAAS evidence -- with the exception of certain

3

testimony concerning delayed disclosure -- as lacking "a sufficiently reliable basis in science to be the subject of expert testimony." 234 N.J. 265, 272 (2018). In these consolidated appeals, we consider whether J.L.G.'s invalidation of CSAAS evidence should apply retroactively.

In separate trials of four defendants -- G.E.P., R.P., C.K., and C.P.[1] -- the alleged victims claimed defendants abused them as children. Prosecutors presented expert CSAAS testimony in each case to explain the alleged victims' behaviors. Defendants, whose appeals were pending in the Appellate Division at the time we decided J.L.G., ask us to apply our decision retroactively and reverse their convictions.

The Appellate Division determined that our ruling in J.L.G. should be accorded "pipeline retroactivity" -- it should apply not only in all new trials, but also in any cases that were on direct appeal at the time J.L.G. was decided -- and reversed defendants' convictions.

We now affirm the Appellate Division's pipeline retroactivity determination and reversal of R.P.'s, C.K.'s, and C.P.'s convictions. As to G.E.P.'s convictions, we conclude that the admission of CSAAS evidence at trial was harmless error, and we therefore reinstate his convictions.

---

[1] We use initials and pseudonyms throughout this opinion to protect the identity of the victims.

I.

G.E.P., R.P., C.K., and C.P. were convicted and sentenced for committing sexual crimes against the children of their former romantic partners or, in the case of defendant C.K., his biological child. We glean the following facts from the trial court and Appellate Division records.

G.E.P.

The State claims that G.E.P. repeatedly sexually assaulted Jane during a ten-year period beginning in the mid-1980s. According to Jane, the abuse began when she was six or seven years old and G.E.P. was twenty-six or twenty-seven and living with Jane and her mother. During the trial, Jane testified that G.E.P.'s conduct progressed "from touching [her] butt to touching [her] stomach, then [her] breasts, then eventually [her] vagina . . . [t]hen eventually mouth to vagina, mouth to penis, digital penetration, everything." According to Jane, G.E.P. occasionally bound her breasts with Velcro straps, placed rubber bands and clothespins on her nipples, and made her wear bras with holes cut out.

Jane claimed that she and G.E.P. last had sexual intercourse when she was fifteen years old, after she had accompanied her friends to G.E.P.'s apartment to retrieve alcohol that G.E.P. purchased for them. According to Jane, she and G.E.P. had additional intimate encounters years later during her

winter and summer breaks from college.  Jane explained that G.E.P. repeatedly cautioned her to keep their sexual encounters secret and warned that he could be imprisoned or that her mother and uncle could be imprisoned for their reactions if they ever learned of his abuse.

Years later Jane learned of G.E.P.'s newly adopted daughter who Jane believed resembled herself.  Jane claimed she reported her sexual abuse to police out of fear that G.E.P. would abuse his newly adopted daughter.  At the urging of police, Jane agreed to call G.E.P. and permitted a detective from the Morris County Prosecutor's Office to record the conversation.

During the call, Jane told G.E.P. that she was "confused," "depressed," and "overwhelmed" because she "never felt the same after . . . after what we did when I was younger."  She explained that "the most intense, romantic, and intense sexual experience I ever had was like from eight to sixteen instead of . . . like now I can't find it."  G.E.P. responded, in part, "I know about it, yep. . . . It's a drag because it's like you can't, um, you can't replicate that exactly, you know?  You just can't get that again. . . .  It's one of those things that's, you know, a peak kind of moment."

Later in their conversation, Jane told G.E.P. that she needed "reassurance to know that like it wasn't just sex -- that you really love me and

6

that you really . . . because I don't feel like anybody's ever loved me like that before."  G.E.P. provided that reassurance:

> I still think of it now and I just, you know, I revel in it still, you know?  It's awful how I feel.  [*chuckles*] It's awful how much I miss it sometimes, but I try -- but I don't -- I don't dwell on it and I don't look at it with a sadness; I look at it with a joy, I really do.  I look at it as one of the best things in my life, you know -- like a series of best things, really.  It's like a whole period of just amazing stuff -- to me, you know?  I always felt like it was this greatest gift, you know, and I, you know, don't know there's a way to humanly frame that or let you -- let you see it, but I really do feel like it was an amazing gift.  There's no doubt in my mind that it was. The thing about it is it's like the best chocolate ice cream in the world, and you'll never find another flavor quite like that, you know?  That's how I feel about it.

G.E.P. went on to say, "what was sad for me was there was no way to even touch it -- you know what I mean?  Like it was such a white hot thing and there was no turning, no going back to that level, you know?"  During the same recorded conversation, G.E.P. used "soulmates" to describe his relationship with Jane when she was eight years old, and revealed that he was "nowhere near" as satisfied with his wife with whom he did not share the same "psychic connection" that he shared with Jane when she was a child.

The police obtained search warrants for G.E.P.'s residence and office.  A subsequent search of G.E.P.'s office revealed a plastic bag containing a bra

7

and a toiletry bag containing rope, Velcro straps, rubber bands, and clothespins.

Prior to trial, G.E.P. filed a motion seeking to bar the introduction of CSAAS testimony. G.E.P. claimed that CSAAS testimony was inappropriate in his case because Jane was an adult when she made her allegations against him. The motion court denied G.E.P.'s request, reasoning that Jane claimed the abuse occurred during Jane's childhood. The State also filed a pretrial motion to admit evidence that Jane told a friend on two occasions about Jane's relationship with G.E.P. The court barred that fresh complaint evidence because, as the State conceded, Jane's friend could not recall one of the conversations and could not recall what was discussed during the one conversation she did recall.

During Jane's testimony, the State played audio of the recorded phone call between Jane and G.E.P. The State also introduced the items seized from G.E.P.'s office, and Jane testified that the items were similar to those G.E.P. had used.

Following Jane's testimony, the State presented expert CSAAS testimony from Dr. Anthony D'Urso, a clinical psychologist. After Dr. D'Urso testified, G.E.P. renewed his objection, contending that the jury instructions concerning CSAAS testimony could "be read and misunderstood

8

as excusing an adult." The trial court rejected G.E.P.'s objections and provided CSAAS instructions to the jury that largely tracked the model jury charge then in effect.

The instructions informed the jury that it was permitted to consider Dr. D'Urso's testimony only for the "limited purpose" of "explaining certain behavior of the alleged victim of child sexual abuse." The trial court further instructed that CSAAS expert testimony "may help explain why a sexually abused child may delay reporting about any sexual abuse that may have occurred." Accordingly, Dr. D'Urso's "testimony was admitted only to explain that the behavior of the alleged victim was not necessarily inconsistent with sexual abuse."

The trial court provided the jury additional instructions concerning CSAAS evidence after the State and G.E.P. presented their closing arguments. Defendant objected to the charge, claiming it unfairly permitted the jury to consider CSAAS evidence to explain Jane's silence as an adult about her alleged childhood abuse. In response, the trial court instructed the jurors to use their recollection to remember what ages Dr. D'Urso testified were considered for CSAAS evidence purposes.

G.E.P. was convicted of six counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), and seven counts of second-degree sexual

assault, N.J.S.A. 2C:14-2(b). G.E.P. filed motions for a judgment of acquittal and a new trial, alleging several evidentiary errors. He also renewed his challenge to the admission of CSAAS testimony, arguing that the court failed to properly limit CSAAS evidence to the period during which Jane was a child and that the court improperly admitted evidence of his intimate encounters with Jane after she reached the age of majority.

The trial court denied G.E.P.'s motions and sentenced him to an aggregate term of thirty years. G.E.P. filed a timely notice of appeal and raised the same issues before the Appellate Division.

<u>R.P.</u>

Susan emigrated with her siblings from the Dominican Republic when she was four years old. Upon arriving in the United States, they were greeted by R.P. at the airport and taken to join their mother who had married and lived with R.P.

Susan claims that R.P. began regularly sexually abusing her when she was in third grade and continued to abuse her until she informed her mother two years later. After reporting the abuse to her mother, Susan was examined at a local children's hospital and interviewed by members of the Bergen

County Prosecutor's Office and the Division of Youth and Family Services (DYFS).[2]  R.P. was later arrested.

Following R.P.'s arrest, Susan and her mother moved in with a relative in New York before moving back to New Jersey.  They then relocated to the Dominican Republic because they did not want to participate in R.P.'s upcoming trial.  Nearly a year later, Susan and her mother returned to New Jersey, where prosecutors informed them that their testimony was still needed.  In conversations with her mother, Susan subsequently recanted her allegations of abuse by R.P. and repeated her recantations to multiple attorneys consulted by Susan's mother.

The following month, during an interview with a sergeant from the Prosecutor's Office, Susan pivoted again, withdrew her recantation, and reaffirmed her allegation that R.P. sexually abused her during her time in elementary school.

At trial, the State presented testimony from Susan and the detective from the Prosecutor's Office who initially interviewed Susan.  The State also presented Dr. D'Urso as an expert witness to provide background information about CSAAS and describe its five components.  Dr. D'Urso discussed delayed

---

[2]  DYFS is now the Division of Child Protection and Permanency.

11

or unconvincing disclosures and recantation or retraction, which the syndrome attributes to survivors of child sexual abuse.

R.P. did not object to the State's use of CSAAS evidence at trial. However, during cross-examination, defense counsel asked Dr. D'Urso whether he was aware that other jurisdictions prohibited the use of CSAAS evidence. The State objected, and the trial court subsequently informed the jury that "the child abuse syndrome that we're talking about is accepted here in New Jersey courts, okay. This is a trial in New Jersey and it is accepted by our courts."

R.P. also presented testimony by Dr. Gerald Cooke, a child sexual abuse expert, who testified that "[t]here is no single pattern of behavior in a child that is specific to child sexual abuse," and distinguishes children who have been sexually abused from those who have not.

During its final jury charge, the court provided model CSAAS instructions. A jury convicted R.P. of three counts of first-degree aggravated assault, N.J.S.A. 2C:14-2(a)(1); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).

Following his convictions, R.P. filed a notice of appeal, which was then dismissed for failure to correct deficiencies. R.P. filed a petition for post-

conviction relief asserting that his counsel's ineffectiveness deprived him of his right to appeal. R.P.'s petition was granted and his right to appeal was restored by this Court.

## C.P.

Nancy, C.P.'s stepdaughter, claimed that C.P.'s sexual abuse of her began when she was in third grade. Nancy's mother abandoned Nancy and her siblings when Nancy was in fifth grade. Later that academic year, Nancy moved to Florida to live with her biological father but maintained contact with C.P. and her two half-brothers, who remained in C.P.'s care. Nancy returned to New Jersey to live with her grandmother for seventh and eighth grade and saw C.P. on the weekends. Nancy claims that the abuse continued during this time and that C.P. tried to have sex with her on two occasions. Nancy testified that, during the first time, C.P. "was too large to fit and [she] was kicking and pushing on him," so he stopped. Nancy alleged that the second time she called 9-1-1 but C.P. took the phone away from her and greeted the police outside his house, preventing them from speaking to her.

Nancy eventually confided in her eighth-grade boyfriend about C.P.'s abuse but asked him not to disclose it for fear that the State would remove her siblings. Nancy claimed the abuse continued until later that year when she again moved to Florida to live with her great aunt, to whom she also revealed

13

C.P.'s abuse.  Local detectives were contacted, took a statement from Nancy regarding the abuse, and forwarded the information to law enforcement officers in New Jersey who continued to investigate Nancy's allegations.  C.P. was ultimately arrested and charged in a twenty-two count indictment.

C.P.'s first trial ended in a mistrial when the jury deadlocked.  Before C.P.'s second trial, the State and defendant each sought to introduce CSAAS expert testimony, which had not been presented during the first trial.  The motion court granted both requests.  At the second trial, the State first presented the testimony of Nancy's great aunt and eighth-grade boyfriend, both of whom recounted their respective conversations with Nancy during which she disclosed C.P.'s alleged abuse.  The State then presented the testimony of Dr. Julie Lippman as an expert in child sexual abuse.  Dr. Lippman testified generally about CSAAS and described its five elements.  During her testimony, defense counsel raised concerns that Dr. Lippman was impermissibly using terms like "more than likely."

When Dr. Lippman finished testifying, defense counsel renewed the objection to Dr. Lippman's testimony and moved that it be excluded.  The court denied defense counsel's request, determining that the limiting instructions it provided after Dr. Lippman's testimony, coupled with the

14

CSAAS instructions in its final jury charge, would ensure that the jury did not misuse the testimony.

Nancy testified that she awoke to C.P. "grinding on top of [her]" while he "rub[bed] his penis against [her] vagina." Nancy explained that C.P. digitally penetrated her, performed oral sex on her, made her perform oral sex on him, and that she sometimes would awaken naked to the realization that C.P. "masturbated on [her] face."

Nancy testified further that C.P. warned her that if she told anyone about the abuse, she would no longer be able to see her half-brothers. Nancy also testified that C.P. told her that he loved her and was going to marry her one day and that "this is what little girls do for their fathers." Nancy explained that she hesitated to report the abuse because she was afraid of C.P. and did not want to stop seeing her siblings.

Defendant offered Dr. Elliott Atkins as an expert in child psychology and child sexual abuse. Dr. Atkins explained the "potential for [CSAAS] to be misused" and that CSAAS is criticized for "being presented as something that is scientifically sound" when there is "no scientific basis whatsoever for its development."

During its final jury charge, the trial court recited the model CSAAS instructions. C.P. was convicted of three counts of first-degree aggravated

15

sexual assault, N.J.S.A. 2C:14-2(a)(1); four counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); three counts of third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a); and one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). He was sentenced to an aggregate term of forty-six years.

C.K.

Julie testified that her abuse began when she was six years old and living in a one-bedroom trailer with C.K., her biological father, as well as her mother, younger sister, and brother. Julie detailed how C.K. would pull down her pants, touch her vagina, and digitally penetrate her at night while her mom was away at work and her younger sister was asleep. According to Julie, C.K.'s abuse briefly subsided when she was eight or nine years old and her family moved in with her older sister. Julie alleged, however, that the abuse resumed and progressed when the family moved again.

During a conversation with Julie in the presence of her mother approximately ten years after the alleged abuse began, C.K. asked Julie why she was not respecting him. Julie testified that she responded rhetorically,

"Why would I respect someone who raped me[?]" Julie's mother asked her what she meant, but Julie did not explain. About a week later, Julie confided in a friend from school about C.K.'s abuse. The friend told her mother, who reported the abuse to DYFS.

DYFS contacted the Camden County Prosecutor's Office, and a detective from the Special Victims Unit interviewed and took statements from Julie, C.K., and other family members. C.K. was later arrested and indicted.

At trial, Julie testified about the abuse, her comment to C.K. about not respecting someone who raped her, and her disclosure of the abuse to her friend. Julie explained that she never told C.K. to stop abusing her because she was scared.

Julie's mother confirmed her presence during Julie's retort about not respecting someone who raped her. Julie's mother also testified that she tried to ask Julie about the comment, but Julie did not want to talk about it.

The State then presented the testimony of Dr. Marita Lind, an expert in child abuse pediatrics. Dr. Lind testified about her examination of Julie following the abuse allegations. According to Dr. Lind, Julie "was anxious and also sometimes communicated . . . in ways that were a little awkward. So [she] was unsure if it was social awkwardness or if [Julie] had a learning deficit . . . [but] as [she] spoke with [Julie] more, it became clear that she

17

probably had special learning needs." Dr. Lind also revealed that she conducted a physical examination of Julie and found no "signs of scarring or healed trauma."

Dr. Lippman testified on behalf of the State as an expert witness to "provide very general education to the jury and to the Court." Dr. Lippman described the paper introducing CSAAS as "a very seminal fundamental article" that has "been the basis for a lot of work" since its publication. Dr. Lippman also provided background information on the five elements of CSAAS and testified that the syndrome was "one of the foundations . . . that everyone who works sexual abuse learns about."

After qualifying Dr. Lippman as an expert witness, the trial court provided the jury with the general jury instructions for consideration of expert witness testimony. The judge again provided expert witness instructions during the final jury charge. The court did not provide instructions specific to CSAAS testimony, however. Following its final jury charge, the court asked counsel for both parties at sidebar whether they had "any exceptions to the charge," and both attorneys responded that they did not.

The jury convicted C.K. of three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); four counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and two counts of second-degree endangering the welfare

of a child, N.J.S.A. 2C:24-4(a). He was sentenced to an aggregate term of thirty years.

## II.

Defendants appealed and, after this Court decided J.L.G., the Appellate Division ordered supplemental briefing on the issue of retroactivity and addressed the consolidated appeals in a single opinion. State v. G.E.P., 458 N.J. Super. 436 (App. Div. 2019). "Because all four cases were pending on appeal at the time J.L.G. was issued," the court limited its retroactivity review to "whether pipeline retroactivity is appropriate." Id. at 446. It concluded that pipeline retroactivity "would afford defendants relief from unfair convictions, while not unduly burdening the criminal justice system." Id. at 447. The court ultimately determined that "the admission of CSAAS expert testimony in these four cases calls into question the validity of each guilty verdict" and reversed defendants' convictions. Id. at 443.

In so doing, the Appellate Division explained that J.L.G. was meant "to avoid unjust convictions in which the State's proofs are unfairly bolstered by expert opinion that lacks a reliable basis," id. at 447; "the corroboration of the victim's testimony in each case was far less than in J.L.G.," id. at 449; and "the admission of CSAAS expert testimony met the plain error standard in all

19

four cases" because "it raised a doubt as to the validity of the jury verdict," id. at 448.

We granted certification. 239 N.J. 598 (2019). We also granted amicus curiae status to the American Civil Liberties Union of New Jersey (ACLU).

III.

The prosecutors and Attorney General (collectively, "the State") ask us to reverse the Appellate Division's decision and apply our holding in J.L.G. prospectively because it announced a new rule of law. The State claims it relied in good faith on this Court's reaffirmations of CSAAS evidence prior to our ruling in J.L.G. In its view, the Appellate Division did not properly consider that reliance and erred in according J.L.G. pipeline retroactivity in light of its "seismic" shift in the law. The State warns the Appellate Division's holding will affect approximately forty cases pending on direct appeal and many anticipated applications for post-conviction relief.

The State also criticizes the Appellate Division's determination of plain error in each case. Considering our finding of harmless error in J.L.G., the State claims the Appellate Division did not adequately address how the admitted CSAAS evidence in the consolidated cases was more prejudicial than the CSAAS evidence we deemed harmless in J.L.G. The State also claims the Appellate Division did not properly weigh the impact of new trials on the

20

survivors of child sexual abuse, and that eliciting the same testimony from survivors during new trials will not only be challenging, but also "unwarranted and cruel."

Defendants, on the contrary, claim the Appellate Division properly weighed the retroactivity factors and appropriately accorded J.L.G. pipeline retroactivity. Defendants also reject the State's assertions of harmless error. Defendants argue the trial testimony of the alleged child sex abuse victims concerning their reasons for delaying disclosure could be understood by an average juror. Accordingly, defendants claim that the CSAAS expert testimony concerning delayed disclosure was beyond the bounds permitted by J.L.G. and therefore constitutes plain error warranting reversal.

Defendants also contend that the State's reliance on this Court's pre-J.L.G. jurisprudence is misplaced. In their view, the pre-J.L.G. cases resolved narrower issues of CSAAS admissibility that should be accorded no weight in light of J.L.G.'s rejection of CSAAS evidence. Defendants argue that the winnowing of permissible CSAAS evidence in pre-J.L.G. cases foretold this Court's holding in J.L.G. and undermines the State's claim of justified reliance on CSAAS evidence.

Defendant C.K. independently asserts that, regardless of whether J.L.G. is accorded retroactive effect, reversal of his conviction is required because of

the trial court's failure to provide CSAAS jury instructions mandated by our pre-J.L.G. case law.

The ACLU similarly urges that we affirm the Appellate Division's grant of pipeline retroactivity to J.L.G. but also requests our consideration of complete retroactivity because, in its view, our holding in J.L.G. bore directly on the truth-finding function in criminal matters.

IV.

Although the facts and procedural history of each matter in this consolidated appeal determines the ultimate outcome for each defendant, resolution of the State and defendants' retroactivity arguments presents a question of law. Accordingly, our review of the issue of J.L.G.'s retroactivity is de novo. See US Bank, N.A. v. Hough, 210 N.J. 187, 198 (2012) ("When construing a law, we conduct a de novo review and do not accord any special deference to a trial court's interpretation.").

The underlying legal question to be answered by this Court in deciding whether our holding in J.L.G. will be applied retroactively is whether it "announced" "a new rule of law." State v. Feal, 194 N.J. 293, 307 (2008). A new rule of law is announced "if there is a 'sudden and generally unanticipated repudiation of a long-standing practice.'" Id. at 308 (quoting State v. Purnell,

161 N.J. 44, 53 (1999)). We therefore review briefly the evolution of CSAAS testimony as evidence in child sex abuse cases.

A.

Admission of CSAAS expert testimony was first considered by this Court in 1993, when we held that "CSAAS has a sufficiently reliable scientific basis to allow an expert witness to describe traits found in victims of such abuse to aid jurors." J.Q., 130 N.J. at 556. CSAAS admissibility was "restated and refined" thereafter, until our decision in J.L.G. 234 N.J. at 288.

For example, in 2005 we cautioned that CSAAS experts should not attempt to "connect the dots" between the child victim's behavior and the characteristics of CSAAS. State v. R.B., 183 N.J. 308, 328 (2005). In 2011, this Court held that CSAAS experts may not provide statistical information about "the number or percentage of abuse victims who lie" because it "deprives the jury of its right and duty" to assess the victim's credibility based on the facts and evidence of the particular case. State v. W.B., 205 N.J. 588, 613-14 (2011). Later, we held that, "[a]s a general rule, a CSAAS witness should not be called as the State's initial witness, prior to the testimony of the child victim," and, when giving testimony in one case, should not discuss another case, "particularly a publicized incident that resulted in a conviction." State v. J.R., 227 N.J. 393, 416-17 (2017).

Despite our narrowing of CSAAS expert testimony over the years, "in none of those cases . . . did the Court reassess the scientific underpinning of CSAAS evidence." J.L.G., 234 N.J. at 288.

B.

In J.L.G., the defendant was charged with sexually abusing his girlfriend's daughter, Bonnie. Id. at 273. Bonnie testified about the abuse and that she was scared to disclose it because she believed her mother would kill J.L.G. and go to jail. Id. at 273-74. Defense counsel "highlighted the absence of physical evidence" to support Bonnie's accusations and attacked Bonnie's credibility by emphasizing inconsistencies in her statements and her delay in reporting the sexual abuse. Id. at 275.

The State presented CSAAS evidence at trial, which the defendant tried to bar by pretrial motion. Id. at 275-76. The court ruled that the testimony was relevant because it would assist the jury in evaluating Bonnie's delayed disclosure. Id. at 276. The State called as its CSAAS expert a clinical psychologist who described the five factors of the syndrome and stated that, although she knew nothing about the facts of the case, her testimony was intended to educate the jury about how children who have been sexually abused typically behave. Ibid. The judge gave the jury instructions about how

to consider the CSAAS testimony before the expert took the stand and read the model CSAAS charge in the final jury instructions.  Id. at 276-77.

The State also provided other evidence incriminating J.L.G. -- testimony from a witness who observed J.L.G., with an erection, lying on top of Bonnie; an iPhone recording of a sexual encounter between Bonnie and J.L.G.; intercepted phone calls of J.L.G. apologizing and appealing to Bonnie to withdraw the allegations; and DNA test results indicating that J.L.G. "could not be excluded as a possible contributor."  Id. at 273-75.

The jury convicted J.L.G., and the Appellate Division affirmed his conviction.  We granted certification, limited to "whether the trial court properly denied defendant's motion to exclude the testimony of the State's expert regarding CSAAS," and remanded to the trial court "for a hearing 'to determine whether CSAAS evidence meets the reliability standard of N.J.R.E. 702,[3] in light of recent scientific evidence.'"  Id. at 277-78 (quoting State v. J.L.G., 229 N.J. 606, 607 (2017)).

---

[3]  N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

25

On remand, following an evidentiary hearing, the trial court "concluded that CSAAS evidence did not meet the standard for admissibility under N.J.R.E. 702." Id. at 279. After considering the trial court's findings, we determined that "there is consistent and long-standing support in the scientific literature that most child victims of sexual abuse delay disclosure," id. at 294, but "[n]one of the other features that comprise CSAAS have achieved sufficient acceptance in the scientific community to be considered reliable evidence under Rule 702," id. at 302. Although we ultimately found the admission of CSAAS evidence in J.L.G. was harmless error because of the overwhelming evidence of J.L.G.'s guilt, id. at 306, we limited the use of CSAAS expert evidence to "delayed disclosure," stating that

> [t]rial judges must exercise care to limit the testimony and bar any reference to "CSAAS," an abuse "syndrome," other CSAAS "behaviors" aside from delayed disclosure, or causes for delayed disclosure. The testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion.

> [Id. at 303.]

Additionally, we instructed, consistent with N.J.R.E. 702, that the facts of each individual case will determine whether a victim's delayed disclosure is "beyond the ken of the average juror." Id. at 305. For example, a young child

26

may not be able to offer a rational explanation for delayed disclosure, but a teenager might. Ibid. Trial courts were also instructed to "provide appropriate limiting instructions to the jury -- both before an expert witness testifies and as part of the court's final charge." Id. at 304.

Although, as noted above, we restricted the scope of CSAAS testimony in the years between J.Q. and J.L.G., our ruling in J.L.G. that CSAAS evidence lacks scientific reliability represents a fundamental and unexpected shift in the law. As we explicitly stated in J.L.G., none of the prior cases that limited the scope of CSAAS "reassess[ed] the scientific underpinning of CSAAS evidence." J.L.G., 234 N.J. at 288.

Plainly, in J.L.G., this Court announced a new rule -- "expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials." Id. at 272. Indeed, although defendants claim the winnowing of permissible CSAAS evidence in pre-J.L.G. cases foretold this Court's holding in J.L.G., undermining the State's claim of justified reliance on CSAAS evidence, the State and all four defendants agree that J.L.G. announced a new rule of law.[4]

---

[4] R.P. contends that J.L.G.'s holding with respect to delayed disclosure was not a new rule.

27

V.

Because J.L.G. announced a new rule, we must consider to what cases that rule should apply. There are four options: (1) prospective application, (2) application "in future cases and in the case in which the rule is announced," (3) "'pipeline retroactivity,' rendering it applicable in all future cases, the case in which the rule is announced, and any cases still on direct appeal," or (4) "complete retroactive effect." State v. Knight, 145 N.J. 233, 249 (1996) (quoting State v. Burstein, 85 N.J. 394, 403 (1981)). We applied the new rule in J.L.G., ruling out purely prospective application. See 234 N.J. at 306. We therefore consider the three remaining options.

Our consideration is guided by three factors: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." State v. Henderson, 208 N.J. 208, 300 (2011) (quoting Knight, 145 N.J. at 251). We do not accord those factors "equal weight." Id. at 301. "The first factor, the purpose of the new rule, is often the pivotal consideration." Burstein, 85 N.J. at 406.

Here, application of that first factor rules out full retroactivity. Only if the old rule "'substantially impair[ed] [the] truth-finding function' and raises

28

'serious question about the accuracy of guilty verdicts in past trials'" should complete retroactivity apply. Feal, 194 N.J. at 308-09 (quoting Burstein, 85 N.J. at 406-07). In Burstein, this Court cited examples of cases in which the "drastic result" of complete retroactivity was applied:

> Complete retroactivity has . . . been given to the requirement that the State may not escape its burden of proof beyond a reasonable doubt by using presumptions to shift burdens of proof to the defense, Hankerson v. North Carolina, 432 U.S. 233 (1977); the requirement that, in juvenile proceedings, the State prove beyond a reasonable doubt all elements of an offense that would constitute a crime if committed by an adult, Ivan V. v. City of New York, 407 U.S. 203 (1972); the right to counsel at preliminary hearings in which a defendant must assert certain defenses or lose them, Arsenault v. Massachusetts, 393 U.S. 5 (1968); the rule barring the admission of one co-defendant's extrajudicial confession implicating another defendant, Roberts v. Russell, 392 U.S. 293 (1968); the right to counsel at trial, Pickelsimer v. Wainwright, 375 U.S. 2 (1963); and the requirement that a confession made some time ago meet current standards of voluntariness, Reck v. Pate, 367 U.S. 433 (1961).
>
> [85 N.J. at 407.]

The rule announced in J.L.G. manifestly differs from those examples. In J.L.G., we sought to enhance the "fact-finding process"; we did not conclude that admission of CSAAS testimony "'substantially impair[ed]' the accuracy of that process." See Feal, 194 N.J. at 309 (quoting Burstein, 85 N.J. at 410).

29

Indeed, J.L.G. acknowledged this Court's efforts in the years before to ensure the accuracy of past verdicts by refining CSAAS evidence. J.L.G.'s limitation of CSAAS evidence thus bears upon "the Court's own standards for criminal justice" and is unsuitable for complete retroactivity. See State v. Czachor, 82 N.J. 392, 409 (1980) (suggesting that complete retroactivity is largely reserved for new rules which "rest on constitutional grounds").

The first factor also militates against limiting the application of J.L.G.'s rule to future cases, aside from J.L.G. itself. The typical example of a new rule that would generally be applied only prospectively is an exclusionary rule whose primary goal is deterrence. See Burstein, 85 N.J. at 406. In J.L.G., by contrast, we focused on N.J.R.E. 702, see 234 N.J. at 301-04, acknowledging the importance of ensuring "that proceedings are fair to both the accused and the victim" and that courts "must assess whether expert testimony is sufficiently reliable before it can be presented to a jury," id. at 307-08. Although the rule set forth in J.L.G. "did not 'substantially' impair the accuracy of [the factfinding] process," it aimed to do more than to forestall certain conduct going forward -- it was "designed to enhance the reliability of the factfinding process." See Burstein, 85 N.J. at 408. In short, the first factor favors pipeline retroactivity.

30

We therefore consider whether the second and third retroactivity factors outweigh the first here. See id. at 408-09. "Under the degree-of-reliance factor, the State must have administered the old rule in 'good faith reliance [on] then-prevailing constitutional norms.'" Feal, 194 N.J. at 311 (alteration in original) (quoting Purnell, 161 N.J. at 55). We determine that the State in each defendant's case acted in good faith. Defendants' trials occurred in 2009, 2015, and 2016. Although we narrowed the permissible scope of CSAAS evidence after J.Q. in 1993, we did not "reassess the scientific underpinning of CSAAS evidence" until 2018. See J.L.G., 234 N.J. at 288. Accordingly, the State reasonably relied on the old rule. As to "the effect a retroactive application would have on the administration of justice," Henderson, 208 N.J. at 301 (quoting Knight, 145 N.J. at 251), it is estimated that approximately forty cases would be affected by pipeline retroactivity. Notably, this number is far short of that held sufficient in Henderson to warrant non-retroactivity. See id. at 302 (estimating retroactivity would affect "an immense number of cases -- far too many to tally"). We conclude that giving pipeline retroactivity to J.L.G. would not present an unreasonable burden on the administration of justice.

When all factors bearing upon retroactivity are weighed -- whether the rule's purpose "would be furthered by a retroactive application," the State's

31

reliance on the previous rule, and "the effect a retroactive application would have on the administration of justice," id. at 300 (quoting Knight, 145 N.J. at 251) -- we find that pipeline retroactivity is appropriate. Cf., e.g., State v. Adkins, 221 N.J. 300, 313 (2015) (giving pipeline retroactivity to new rule regarding blood draws in drunk driving cases); State v. Wessells, 209 N.J. 395, 412 (2012) (giving pipeline retroactivity to new rule regarding right to counsel and limitations on continuing interrogation); State v. Cummings, 184 N.J. 84, 98-100 (2005) (giving pipeline retroactivity to new rule increasing burden of proof from preponderance of evidence to beyond a reasonable doubt in DWI cases relying on breathalyzer).

We are mindful of and find compelling the survivors' interests here, but we cannot place their well-founded concerns about having to testify again above a defendant's right to a fair trial.

## VI.

Having concluded that pipeline retroactivity applies, we must decide whether admission of CSAAS expert testimony in each defendant's case was reversible error.[5] Initially, only G.E.P. objected to the introduction of CSAAS

---

[5] We did not find in J.L.G. and we do not find here that the model CSAAS jury instruction compounded the mistaken admission of CSAAS testimony in G.E.P.'s, R.P.'s, or C.P.'s trials.

evidence at trial, necessitating our review for "harmful error" -- "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." State v. Mohammed, 226 N.J. 71, 86-87 (2016) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 338 (1971)).[6] Generally, failure to "object or otherwise preserve an issue for appeal at the trial court level" limits appellate review to a plain error inquiry. State v. Santamaria, 236 N.J. 390, 404 (2019). Plain errors are those "clearly capable of producing an unjust result." R. 2:10-2. In the context of a jury trial, the possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). We apply those principles to each defendant's appeal.

## A.

## G.E.P.

In addition to the victim's testimony, G.E.P.'s testimony, and CSAAS evidence, G.E.P.'s trial also included a recorded phone call between Jane and G.E.P., and the straps, clothespins, and other items seized from G.E.P.'s office.

---

[6] C.P. objected to the scope of the CSAAS evidence at his trial, but not to the introduction of CSAAS evidence in general.

Considering this evidence, we find that the admission of CSAAS testimony did not deny G.E.P. "a fair decision on the merits." Mohammed, 226 N.J. at 87.

The straps, clothespins, rubber bands, and bra that were seized from G.E.P.'s office matched Jane's description of items G.E.P. used on Jane and corroborated her testimony. And while G.E.P. "did not admit to any specific sexual activity" on the recorded call with Jane, his responses were damning, compelling evidence of guilt. "It's a drag because it's like you can't, um, you can't replicate that exactly, you know? You just can't get that again. . . . It's one of those things that's, you know, a peak kind of moment,"; "[W]hat was sad for me was there was no way to even touch it -- you know what I mean? Like it was such a white hot thing and there was no turning, no going back to that level, you know?" G.E.P. used the term "soulmates" to describe his relationship with Jane when she was eight years old and said he was "nowhere near" as satisfied with his wife, with whom he did not share the same "psychic connection" that he shared with Jane when she was a child. A jury heard and assessed the recording, as well as G.E.P.'s and Jane's testimony.

Finally, G.E.P. raises a number of other, but related evidentiary rulings of the trial court. We review them "for a 'clear error in judgment'" and refrain from "substitut[ing] our own judgment for the trial court's" in the absence of a trial court ruling evincing "'a manifest denial of justice.'" State v. Medina,

34

___ N.J. ___, at ___ (2020) (slip op. at 19) (first quoting State v. Scott, 229 N.J. 469, 479 (2017); then quoting State v. Brown, 170 N.J. 138, 147 (2001)).

Under that deferential standard, we do not find that the trial court abused its discretion in admitting, as background information about their relationship and to show why Jane delayed disclosing the abuse, evidence of intimate contact between G.E.P. and Jane when she was an adult. Nor did the trial court abuse its discretion in admitting evidence seized from G.E.P.'s office, finding that "[t]he possession of these seemingly disparate items together, in a toiletry bag, recovered from [G.E.P.'s] place of business, does justify a reasonable inference that [Jane] is credible in her testimony," and that "[t]he use of these items upon the victim is unique enough to warrant the admission of the items despite the passage of time."

Finally, G.E.P. claims inadmissible fresh complaint evidence was heard by the jury when Jane said during direct examination, "my girlfriends knew that I was having a sexual relationship with [G.E.P]," and a mistrial should have been granted. We disagree. The trial judge promptly struck the challenged fresh complaint testimony from the record and instructed the jury that it could not use the statement for any purpose. The instruction was "firm, clear, and accomplished without delay." State v. Prall, 231 N.J. 567, 586

35

(2018) (quoting State v. Vallejo, 198 N.J. 122, 134 (2009)). The trial court therefore properly denied G.E.P.'s motion for a mistrial.

B.

R.P., C.P., C.K.

We do not reach the same conclusion as to defendants R.P., C.P., and C.K. Aside from the CSAAS evidence presented, these cases were based largely upon the testimony of R.P., C.P., C.K., and their alleged victims. CSAAS testimony bolstering the alleged victims' testimony was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," Jordan, 147 N.J. at 422 (quoting Macon, 57 N.J. at 336), and therefore was clearly capable of producing an unjust result as to R.P., C.P., and C.K. Their convictions were thus properly reversed by the Appellate Division.

As the State acknowledged in its closing in R.P., "The victim, admittedly, is the majority of our case." Aside from CSAAS testimony, the State's evidence included Susan's testimony; the videos of Susan's interviews with investigators describing the abuse; and Susan's mother's testimony, which was based on what Susan told her. Unlike in G.E.P., here, aside from the CSAAS testimony, there was no additional evidence that corroborated Susan's allegations.

36

In <u>C.P.</u>, the State likewise explained, "[I]f you believe [Nancy], then the Defendant's guilty." The State's evidence consisted of Nancy's testimony, CSAAS expert testimony, and witnesses that repeated Nancy's allegations. Although C.P. offered rebuttal CSAAS testimony, we cannot presume that it cured the error.

Finally, in <u>C.K.</u>, the prosecutor opened by noting, "[T]hat's what this case is about, testimonial evidence. . . . There's no DNA. There's no injuries." None of the evidence directly corroborated Julie's allegations. As to the State's CSAAS evidence regarding delayed disclosure, while it is not clear whether Julie was able to explain her delay -- Dr. Lind testified that Julie struggled with communication -- Julie was never directly asked why she waited to disclose the abuse on direct or cross-examination. She was only asked if she ever told C.K. to stop abusing her, and she responded that she never did because she was scared. Furthermore, the State's CSAAS expert did not limit her testimony to delayed disclosure but testified as to all five CSAAS factors.

## VII.

For the reasons set forth above, we affirm in part and reverse in part. We affirm the judgment of the Appellate Division as to R.P., C.P., and C.K., but reverse as to G.E.P. and reinstate his convictions.

37

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion.